UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JACK ESTEP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 6:18-CV-23-REW |
| v. | ) | |
| | ) | OPINION & ORDER |
| STEVE COMBS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*  \*\*\*  \*\*\*  \*\*\*

"My wife's going to kill me," thought Jack Estep as he was booked at the Harlan County Jail near midnight on the eve of his wedding anniversary. The charges: menacing, resisting arrest, and obstruction. Estep believed he would be "dead meat" when his wife learned of his untimely arrest. An investigation of his son's unlicensed taxidermy, and Estep's abrupt intervention, had landed him in the clink.

This case concerns the legitimacy of state game warden Steve Combs's arrest of Estep. From a county that is no stranger to strife,[1] the tension between the Esteps and Combs is an unlikely candidate for the history books. It is, nonetheless, a saga all its own and its apex (or, perhaps, nadir) ultimately put the parties on this Court's docket.

## I.   BACKGROUND

After two rounds of dispositive motion practice, four of Estep's claims survive: false arrest and excessive force theories under 42 U.S.C. § 1983 and Kentucky law malicious prosecution and

---

[1]  *See* "Lessons from Bloody Harlan," *The Economist* (Sep. 26, 2019), *available at* https://www.economist.com/united-states/2019/09/26/lessons-from-bloody-harlan.

false imprisonment allegations.[2] Combs now seeks summary judgment on each. *See* DE 55 (Motion). The motion—fully briefed, *see* DE 61 (Response), DE 62 (Reply)—stands ripe for review. For the following reasons, and under the applicable standards, the Court finds only partial summary judgment warranted. The Court will permit Estep to proceed with his Fourth Amendment unduly tight handcuffing claim and state malicious prosecution claim. Combs is entitled to summary judgment on Estep's two other claims.

Plaintiff seeks recovery based on the following factual scenario:[3] shortly after 10:20 p.m. on December 21, 2016, Defendant Steve Combs[4] arrived at the residence of Tim Estep (Plaintiff's son). Combs proceeded up a ramp to the residence and, from the porch, began questioning Tim about taxidermy licensure. Reports of Tim advertising "European Mounts" for "50 bucks" each, motivated Combs's investigation.[5] Tim told Combs that he had not commercially profited from the nascent business plan, that he, to date, had completed mounts only for family members, and—having recently learned of the regulatory requirement—intended to secure a license in short order. Nonetheless, as the video makes clear, Combs had persisting doubts.

---

[2] *See* DE 23 (Order fully dismissing Combs in his official capacity on immunity grounds); DE 29 (Order granting, in part, motion to dismiss individual capacity claims).

[3] In the summary judgment context, the Court typically "view[s] all evidence, and draw[s] all reasonable inferences, in the light most favorable to the nonmoving party," here Estep. *Kent v. Oakland Cnty.*, 810 F.3d 384, 390 (6th Cir. 2016) (internal alteration removed). However, the Court must adjust its viewpoint if video evidence "clearly contradicts" the non-movant's narrative. *Ayala v. Hogsten*, 786 F. App'x 590, 591 (6th Cir. 2019). In such circumstances, the Court must view "the facts in the light depicted by the videotape." *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007). For events not depicted on film, or those fairly subject to varying inferences, the Court's obligation to adopt Estep-favorable interpretations persists. *See Ayala*, 786 F. App'x at 592. Under these standards, the Court assesses (and, here, recites) the facts in favor of Estep or, where apt, the video. *See, e.g.*, DE 57-2 (hereinafter "Estep Dep.").

[4] Combs is a "Conservation Officer with [the] Kentucky Department of Fish & Wildlife" Resources. DE 57-1 (hereinafter "Combs Dep.") at 6. The Court's citations track deposition, rather than ECF, pagination.

[5] December 4, 9, 10, and 13, Facebook postings from "Tim N Torie Estep," submitted as exhibits, confirm the undisputed (at least on this record) basis for the investigation. *See* DE 56.

Roughly 5 minutes after Combs's arrival, Plaintiff Jack Estep received a call from his daughter-in-law, Victoria Estep. Mrs. Estep advised that Defendant Combs was harassing Tim at their home. She requested Plaintiff's assistance. Plaintiff arrived at his son's residence shortly thereafter (around 10:30 p.m.) and found Combs standing on the front porch.

Upon the elder Estep's arrival, the parties had the following exchange as Estep approached, climbed the ramp, and came face-to-face with Combs:

| | |
|---|---|
| Estep: | What's your problem Steve? |
| Combs: | Nothin'. |
| Estep: | Get your ass outta here. You got a warrant? |

DE 59 at 23:31:10 to :19.[6] Then, on the residence threshold:

| | |
|---|---|
| Combs: | I'm investigating something. If you don't back up outta my face, you're going to jail. |
| [At this point, Combs puts his finger in Estep's chest.] | |
| Estep: | Put me out of your face. . . . You ain't doin' shit. |
| Combs: | You're goin' to jail. |
| Estep: | No, this is my son's property. I told you to get out of here. |

*Id.* at 23:31:20 to :30. From here, Combs grabs Estep by the arm and repeats "you're goin' to jail." Estep pulls his arm away saying, "I'm not goin' nowhere." Combs questions: "You gonna resist?" Estep fends off another Combs collar attempt and, again, inquires about a warrant. Combs advises he does not need one; Estep insists he does. Finally, Estep withdraws into his son's residence, pulling away from Combs's final attempt to take hold of his jacket, while Combs instructs him to "get out here" and, again, advises "you're going to jail." *Id.* at 23:31:31 to :40. The parties' verbal exchange, with Estep in his son's home and Combs on the threshold, continues for another minute

---

[6] Everything in the record, save the video itself, indicates that time stamps from Combs's body-cam footage are off by about an hour. Nonetheless, the Court, for clarity, cites the times reported on the video.

before Combs radios for backup. *Id.* at 23:33:00.[7] In the eight minutes of jawing that preceded arrival of State Police troopers, Combs twice reiterates that he was there investigating taxidermy issues (and the parties continue to discuss the topic). *See id.* at 23:36:25, 23:39:30.

Eventually, the Esteps permitted State Police to enter the residence and, after some discussion, convinced Jack Estep to exit. And, roughly 12 minutes after the confrontation began, Combs cuffed Plaintiff, walked him to his vehicle, and placed him in the back seat. The video records approximately 4.5 minutes of cuffed time and ends shortly before the pair's departure. Per Estep, Combs then drove directly to the Harlan County Jail, a 12-or-so minute drive. Estep Dep. at 102. At the Jail, Combs stopped in the parking lot and began writing a citation. Sometime after (the record is not clear how long, exactly), Estep first complained about the tightness of the handcuffs and asked Combs to loosen them because "they're killing me." Fifteen minutes later, with no response from Combs, Estep repeated his complaint and his request. As Estep tells it, Combs "acted like he didn't hear" either protest and removed the cuffs only after entering the Jail. Estep claims his wrist was bleeding from the cuffs. A photograph taken after Estep's release the next morning shows significant bruising and a scabbed-over wound on Estep's wrist. *See* DE 58-1.

On February 13, 2017, the Harlan District Court, following a hearing during which Combs testified, granted Estep's motion to suppress evidence relating to the resisting, menacing, and interference charges and, the same day, entered an Order dismissing all charges for lack of

---

[7] Notably, Combs, within 2 minutes of the conclusion of any physical interaction, characterizes Estep's conduct as "menacing," "resisting arrest," and "interfering." *Id.* at 23:32:00 to :10; *id.* at 23:33:00. In response to Estep's claim that "I didn't do anything," Combs further alleges "you just got right up in my face and balled your fists up"; Estep confirmed he "got right up in your face" but contends "as long as I didn't touch you or threaten you I'm fine." *Id.* at 23:33:15 to :30. Estep, though denying making threats, never denies balling his fists.

evidence. *See* DE 61-2 (Harlan District Court Orders). This suit, first filed in Harlan Circuit Court and then removed, followed. *See* DE 1-1 at 4 (Jan. 2, 2018, Compl.).

## II.     APPLICABLE STANDARDS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). However, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party

5

moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

Defendant primarily argues the existence of probable cause and, alternatively, that immunity doctrines shield him from Estep's claims. *See* DE 55-1 at 9–22. The Court analyzes the federal and state issues distinctly.

## III.   FEDERAL CLAIMS

### A.   *Qualified Immunity Standard*

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 102 S. Ct. 2727, 2738 (1982); *see also, e.g.*, *Robertson v. Lucas*, 753 F.3d 606, 610 (6th Cir. 2014)

(affirming grant of qualified immunity to state and federal law enforcement officers); *Barnes v. Wright*, 449 F.3d 709, 711 (6th Cir. 2006) (reversing denial of qualified immunity to law enforcement officers in a § 1983 suit).

Since Defendant has "raised the qualified immunity defense, plaintiff bears the burden of showing that defendant[ is] not entitled to qualified immunity." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015). To evaluate the qualified immunity question, courts engage in a two-part inquiry: "First, taken in the light most favorable to the party asserting the injury, do the facts alleged show that the officer's conduct violated a constitutional right? Second, is the right clearly established?" *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009) (holding that courts may address the two questions in either order). The right must be "so clearly established in a particularized sense that a reasonable officer confronted with the same situation would have known that his conduct violated that right." *Moseley*, 790 F.3d at 653. The Court must avoid "a high level of generality" in assessing the clarity of the right or misconduct. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established. . . . This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted) (citing *Brosseau v. Haugen*, 125 S. Ct. 596 (2004))). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct beyond debate. This demanding standard protects all but the plainly incompetent or those who knowingly violate the law." *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (internal quotation marks and citations removed).

B.  *False Arrest*

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 99 S. Ct. 2689, 2695 (1979). Estep had, however, a "Fourth Amendment right to be arrested only upon probable cause." *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003). "[P]robable cause determinations involve an examination of all facts and circumstances *within an officer's knowledge at the time of an arrest*." *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 310 (6th Cir. 2005) (citing *Carroll v. United States*, 45 S. Ct. 280, 288 (1925)) (emphasis in original).

> A police officer has probable cause if there is a "fair probability" that the individual to be arrested has either committed or intends to commit a crime. *Northrop v. Trippett*, 265 F.3d 372, 379 (6th Cir. 2001) (quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)), *cert. denied*, 535 U.S. 955, 122 S. Ct. 1358, 152 L. Ed. 2d 354 (2002). A police officer determines the existence of probable cause by examining the facts and circumstances within his knowledge that are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979).

*Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). Probable cause is a common-sense, "fluid," "practical," and "nontechnical" analysis that looks (through an objective prism) to the totality of the circumstances known at the time. *Maryland v. Pringle*, 124 S. Ct. 795, 799–800 (2003); *Whren v. United States*, 116 S. Ct.  1769, 1773-74 (1996); *Illinois v. Gates*, 103 S. Ct. 2317, 2331-33 (1983). The standard requires "more than mere suspicion" but not "evidence to establish a prima facie case . . . much less evidence sufficient to establish guilt beyond a reasonable doubt." *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998). Probable cause exists if there is a reasonable basis for belief that a person committed a particular crime. *See, e.g.*, *United States v. McClain*, 444 F.3d 556, 562-63 (6th Cir. 2005). "The existence of probable cause is a jury question, unless there

is only one reasonable determination that is possible." *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003).

Combs claims the events of December 21, 2016, gave him probable cause to arrest Estep for three Kentucky crimes: resisting arrest (KRS 520.090), menacing (KRS 508.050), and obstructing or interfering with an officer (KRS 150.090(6)). The Court, on review of the full record and applying the requisite standard, concludes that facts known to Combs prior to the arrest supplied probably cause to believe—or, at minimum, were sufficient for a reasonable officer to conclude—Estep obstructed and/or interfered with a lawful investigation. Though the Court sees no basis for finding, at least as a matter of law, probable cause to arrest for menacing or resisting, Combs only needed one valid ground to lawfully arrest Estep. *See Devenpeck v. Alford*, 125 S. Ct. 588, 593–95 (2004); *Howse v. Hodous*, 953 F.3d 402, 409 (6th Cir. 2020) ("[T]he constitutional tort claim of false arrest fails so long as there's just one valid reason for the arrest."); *Sykes v. Anderson*, 625 F.3d 294, 306 (6th Cir. 2010) ("an offense"). Because undisputed facts known to Combs justified a reasonable belief that Estep was violating (or did violate) KRS 150.090(6) on the evening in question—and, in the Court's view, no juror could rationally conclude otherwise— Defendant is entitled to summary judgment on the false arrest claim.

<u>Issue Preclusion</u>

Preliminarily, the Court addresses (and rejects) Plaintiff's contention that offensive issue preclusion bars any attempt by Defendant to litigate the probable cause question. Estep argues that Combs, given his state hearing testimony, acted as an agent of the Commonwealth for purposes of the Harlan prosecution—indeed, per Estep, Combs "as the sole arresting officer and Commonwealth witness, was in fact controlling the prosecution[.]" DE 61 at 8. Thus, Plaintiff's theory goes, the suppression and ultimate dismissal of the charges for lack of evidence operate to

9

foreclose further defensive argument on the topic of probable cause because Combs "had the opportunity to present proofs and argument, and has already had his day in court even though he was not a formal party to the litigation." DE 61 at 8.

The Sixth Circuit has explained:

> Res judicata generally includes two separate concepts - claim preclusion and issue preclusion. Claim preclusion, or true res judicata, refers to [the] effect of a prior judgment in foreclosing a subsequent claim that has never been litigated, because of a determination that it should have been advanced in an earlier action. Issue preclusion, on the other hand, refers to the foreclosure of an issue previously litigated.

*Mitchell v. Chapman*, 343 F. 3d 811, 818 n.5 (6th Cir. 2003) (citing *Migra v. Warren City School Dist. Bd. of Educ.*, 104 S. Ct. 892, 894 n.1 (1984)). Plaintiff seeks application of the latter. For § 1983 suits, "issues actually litigated in a state-court proceeding are entitled to preclusive effect in a subsequent federal § 1983 suit to the extent provided by the law of preclusion in the state where the judgment was rendered." *Donovan v. Thames*, 105 F.3d 291, 294 (6th Cir. 1997) (citing *Allen v. McCurry*, 101 S. Ct. 411, 419 (1980)).[8] In Kentucky, a party seeking issue preclusion must establish five elements: "(1) at least one party to be bound in the second case must have been a party in the first case; (2) the issue in the second case must be the same as the issue in the first case; (3) the issue must have been actually litigated; (4) the issue was actually decided in that action; and (5) the decision on the issue in the prior action must have been necessary to the court's judgment and adverse to the party to be bound." *Miller v. Admin. Office of Courts*, 361 S.W.3d 867, 872–73 (Ky. 2011) (internal quotation marks omitted); *Preferred Care of Delaware, Inc. v. Crocker*, No. 16-6179, 2017 WL 3223003, at *2 (6th Cir. Feb. 28, 2017) (same); *see also Caudill*

---

[8] Given the Court's statutory full faith and credit obligation, 28 U.S.C. § 1738, the instant analysis applies with equal force to Estep's preclusion theory as applied to the state false imprisonment and malicious prosecution claims. *See also Middleton v. PNC Bank, NA*, 785 F. App'x 341, 343 (6th Cir. 2019) ("State law determines the preclusive effect of a prior state-court action.").

*v. Johnson*, No. 2016-CA-001208-MR, 2018 WL 300457, at *5 (Ky. Ct. App. Jan. 5, 2018) ("For a party to successfully assert the doctrine, he or she **must establish**" the issue preclusion predicates. (emphasis added)).

Estep's preclusion effort fatally falters at hurdle one. "[A] person who was not a party to the former action nor in privity with such a party" may **assert** issue preclusion, but only **against** "a party to th[e] former action." *Miller*, 361 S.W.3d at 872. Plaintiff cites no authority for the proposition that participation through testimony renders a witness a "party" for Kentucky issue preclusion purposes. *Compare* DE 61 at 8–9, *with Fleming v. EQT Gathering, LLC*, 509 S.W.3d 18, 23 (Ky. 2017) (characterizing *Durst v. Amyx*, 13 S.W. 1087, 1088 (Ky. 1890): "adjudication of boundary line dispute did not bar subsequent ownership claims of women who were not made parties to the adjudication, even though their husbands were parties"). On the other hand, abundant sharply contrary authority persuasively holds that "a criminal-defendant-turned-civil plaintiff cannot offensively use collateral estoppel, because the police officers are not in privity for mutuality purposes with the prosecution in the criminal case." *White v. Pelland*, No. 07-CV-10962, 2008 WL 1735378, at *16 (E.D. Mich. Apr. 14, 2008) (citing *Burda Brothers, Inc. v. Walsh*, 22 F. App'x. 423, 430 (6th Cir. Oct. 12, 2001)); *Von Herbert v. City of St. Clair Shores*, 61 F. App'x 133, 136 n.1 (6th Cir. 2003) (applying Michigan law); *Kegler v. City of Livonia*, No. 97–2206, 1999 WL 133110 (table) (6th Cir. Feb. 23, 1999), *cert. denied*, 119 S. Ct. 2396 (1999) (applying Michigan law); *Wallace v. Mamula*, 93–3603, 1994 WL 389197 (table) (6th Cir. Jul. 26, 1994) (applying Ohio law).

Estep's minimal showing also fails to establish any of the other four predicates. "Issue preclusion requires the issue decided in the earlier litigation to be the same as the one currently before the court." *Miller*, 361 S.W.3d at 874. The trial court documents do not in any way indicate

the basis for suppression. And, a post-suppression dismissal for lack of evidence does not demonstrate that the existence of probable cause (on an inclusive record, *i.e.*, the topic for which Estep now pursues preclusion) was ever at-issue, actually decided, or necessarily litigated in the state court proceedings.

At bottom, "[t]he rule contemplates that the court in which [issue preclusion] is asserted shall inquire whether the judgment in the former action was in fact rendered under such conditions that the party against whom [issue preclusion] is pleaded had a realistically full and fair opportunity to present the case." *Miller*, 361 S.W.3d at 872 (quoting *Moore v. Commonwealth*, 954 S.W.2d 317, 319 (Ky. 1997)). That Combs testified and that the Harlan District Court suppressed some evidence and dismissed the charges are each undisputed facts. However, those facts are also the only relevant facts, on this topic, in the record.[9] When, as here, "there is nothing to indicate 'what facts were presented, what evidence was considered by the state court, or on what basis that court" suppressed evidence or, ultimately, dismissed the charges, there is no valid basis to preclude probable cause litigation. *See Stigall v. Louisville Jefferson Cty. Metro Gov't*, No. 3:18-CV-168-CRS, 2018 WL 4775506, at *2 (W.D. Ky. Oct. 3, 2018) (rejecting issue preclusion under Kentucky law based on "a probable cause determination at a postarrest preliminary hearing") (quoting *United States v. Jimenez*, No. 5:13-CR-00045-TBR-1, 2014 WL 2816018, at *4 n.3 (W.D. Ky. June 23, 2014), *aff'd*, 654 F. App'x 815 (6th Cir. 2016)); *Cf.* (rejecting issue preclusion theory and finding that district court's jurisdictional dismissal ruling did not necessitate a merits resolution of the issue presented).

---

[9] Estep cites nothing to substantiate his briefing's characterization of the suppression motion as based on "lack of probable cause[.]" DE 61 at 3. In the non-warrant, non-search context, this does not facially make sense.

<u>Resisting Arrest</u>

In the Commonwealth,

A person is guilty of resisting arrest when he intentionally prevents or attempts to prevent a peace officer, recognized to be acting under color of his official authority, from effecting an arrest of the actor or another by:
(a) Using or threatening to use physical force or violence against the peace officer or another; or
(b) Using any other means creating a substantial risk of causing physical injury to the peace officer or another.

KRS 520.090. The statutory commentary explains that this offense "includes only forcible resistance and excludes other forms of nonsubmission to authority. Neither flight from arrest nor passive resistance are punishable under this section[.]" *Id.*, cmt. LRC/Ky. Crime Comm'n. The video (at least arguably) shows no more than passive resistance. Combs, himself, characterized Estep's conduct as "pull[ing] away," "evasive measures[,] and confirmed that Plaintiff was "just trying to get away[.]" Combs Dep. at 41–42. In short, none of Estep's pre-arrest actions unequivocally supports a reasonable belief that a KRS 520.090 violation was either completed or ongoing. *See Arnold v. Wilder*, 657 F.3d 353, 365 (6th Cir. 2011) (finding that "pull[ing] away or pull[ing] back when [an officer] attempted to take [plaintiff] into custody" was not an action that "constitutes resisting arrest" under Kentucky law). Accordingly, Combs warrants no dispositive relief based on the resisting charge.

<u>Menacing</u>

In Kentucky, "[a] person is guilty of menacing when he intentionally places another person in reasonable apprehension of imminent physical injury." KRS 508.050. Menacing involves "antagonistic behavior focused at another person," and some of the hallmarks include moving closer, using a raised voice or threatening tone, and making physical contact or gestures. *Martin v. Coyt*, No. 1:10-cv-176-R, 2012 WL 1574823, at *10 (W.D. Ky. May 3, 2012). Other factors

include whether a potential aggressor is "armed, intoxicated, or indicating a desire to flee." *Ayala v. Hogsten*, No. 17-47-HRW, 2019 WL 1338391, at *5 (E.D. Ky. Mar. 25, 2019). In one instance, there was probable cause for menacing when a defendant came close to officers, took an aggressive posture, and yelled, even though the defendant may have been raising his hands to comply with the officers' directive rather than to take a swing. *Fultz v. Whittaker*, 187 F. Supp. 2d 695, 702–03 (W.D. Ky. 2001).

Estep directly testified to his intent on the night in question: "To see what was going on. That was my intent. . . . I went down there to see what was going on." Estep Dep. at 131. Nothing in the video plainly shows that Estep intended to physically threaten Combs. Indeed, taken in the light most favorable to Plaintiff, the facts indicate that Estep did not so intend. Estep undisputedly came quite close to (if not, in fact, initiating contact with)[10] Combs. *See* DE 59 at 23:42:00, 23:44:45 (Estep twice stating that he "got in [Combs's] face"). Yet, the significance of that act, under the totality, depends on what version a factfinder accepts. One might reasonably conclude (or, at least, that Combs was warranted in believing) that Estep, having directed Combs to depart using coarse verbiage and a raised voice, approached with the intent to compel Combs to leave through harmful physical force. The same decider might also deem reasonable Combs's fear that Estep might "go further" than getting in his face. Combs Dep. at 39. Another might justifiably think that Estep's physical proximity to Combs was merely a byproduct of the close quarters on Tim Estep's porch, that Estep had no designs on threatening or harming Combs, and that an armed law enforcement officer would not reasonably fear physical harm from a boisterous approach and, at most, a chest bump from an aged retiree. Ultimately, debatable probable cause, such as this, is no ground for summary judgment.

---

[10] A disputed fact that the video does not clearly resolve. *See* Combs Dep. at 39.

<u>Obstructing or Interfering</u>

KRS 150.090,[11] in relevant part, provides:

(2) Conservation officers appointed by the commissioner shall have full powers as peace officers for the enforcement of all of the laws of the Commonwealth[.] . . .

(3) Each conservation officer is individually vested with the powers of a peace officer and shall have in all parts of the state the same powers with respect to criminal matters and enforcement of the laws relating thereto as sheriffs, constables, and police officers in their respective jurisdictions[.] . . .

(4) Conservation officers charged with the enforcement of this chapter and the administrative regulations issued thereunder shall have the right to go upon the land of any person or persons whether private or public for the purpose of the enforcement of laws or orders of the department relating to game or fish, while in the normal, lawful and peaceful pursuit of such investigation or work or enforcement, may enter upon, cross over, be upon, and remain upon privately owned lands for such purposes[.] . . .

(6) **No person shall resist, obstruct, interfere with or threaten or attempt to intimidate or in any other manner interfere with any officer in the discharge of his duties under the provisions of this chapter.**

There is no dispute that Defendant Combs was a lawfully appointed conservation officer. The record is also clear that Combs was on Tim Estep's property (his front porch) for purposes of investigating unlicensed taxidermy work.[12] *See, e.g.*, Combs Dep. at 32; DE 59 at 23:23:00 (Combs, upon initially encountering Tim Estep, requesting "taxidermy licenses"); 23:31:00 (Combs immediately advising Jack Estep "I am investigating something"); 23:36:25 (Combs, after

---

[11] Though Estep does not argue the point, the Court notes that a violation of KRS 150.090 is an arrestable "Class A misdemeanor." KRS 150.990(12).

[12] Taxidermy compliance clearly fell within Combs's investigative mandate. For instance, KRS 140.411 sets requirements for "Taxidermist's records [and] mounting[,]" and KRS 150.4111 governs the "Sale of legally taken wildlife[.]" Further, KRS 150.025(1) authorizes the Department of Fish and Wildlife Resources to regulate the "buying selling, or transporting" of wildlife. Pursuant to that authority, the Department regulates, *inter alia*, "the buying and selling of inedible wildlife parts" via 301 KAR 4:090. Finally, KRS 150.990 provides penalties for violations of statutes and "any administrative regulation" concerning animals "possessed, bought, sold, or transported[.]"

the confrontation with Jack Estep, reiterating what I "**am** investigating" (emphasis added)); DE 56 (Facebook Postings).

Estep, essentially, resists a probable cause finding only on grounds that he did not, as a factual matter, interfere with Combs's investigation. Plaintiff claims he did not: (A) "ask any questions about the investigation;" (B) "tamper with physical evidence;" and (C) "did not obstruct or interfere with Officer Combs in any way **other than** to tell him he needed to leave if he didn't have a warrant." DE 61 at 8 (emphasis added). Yet, Estep offers no authority indicating that the type of interference he **admits** is not a KRS 150.090(6) violation. The statute bars "any [ ] manner" of interference[13] with an officer in the discharge of his duties. No reasonable juror could find that the facts known to Combs failed to justify a probable cause belief that Estep engaged in the very conduct that he now (despite minimization)[14] admits. Plaintiff did not, as the briefing spins the

---

[13] Estep, perhaps, obliquely argues that his interference was somehow privileged or otherwise not properly actionable under KRS 150.090(6). *See* DE 61 at 8. Yet the argument is devoid of citation to supportive authority. "It is not enough for a party to mention a possible argument in the most skeletal way and leave the court to put flesh on its bones." *Brenay v. Schartow*, 709 F. App'x 331, 336 (6th Cir. 2017) (internal citations and quotation marks are omitted). Further, though Estep was lawfully present on his son's property, Combs likely was too (Estep, at least, does not argue otherwise). *See* KRS 150.090(4); 1988-1991 Ky. Op. Att'y Gen. 2-37 (1988). Moreover, even if Combs's presence were somehow unlawful, Estep fails to explain what authority a fellow interloper had to expel Defendant from Tim Estep's property. There may be some zone of constitutionally protected "interference" for which an arrest or prosecution under KRS 150.090(6) would be invalid. *Cf. Greene v. Barber*, 310 F.3d 889, 895 (6th Cir. 2002) ("The law is well established that an act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper." (internal quotation marks and alterations omitted)); *Commonwealth v. Carr*, 312 Ky. 393, 394 (1950). Yet, Estep identifies nothing to privilege his conduct (which, in any event, was materially more than a verbal exchange). Alternatively, Estep may be arguing for a restrictive interpretation of "interfere" in KRS 150.090(6). Yet, Estep proposes no definition. Plaintiff simply claims his actions were non-violative, an assertion belied by the plain statutory text. This undeveloped contention, unadorned by legal or record citations, does not thwart Combs's summary judgment effort.

[14] The Court's obligation to credit Estep's version does not extend to factual contentions clearly contradicted by the video. Plaintiff casts the exchange as an "ask"; the video unequivocally depicts an affirmative demand (indeed, multiple imperatives by Estep).

discourse, politely request that Combs depart his son's property. As Estep himself put it on the

night in question: "I got right in his face and said Steve you need to get out of here and leave." DE

59 at 23:42:00. Plaintiff's physical positioning (relative to the others present), demeanor, and

verbiage during the kerfuffle is also telling. Again, upon Estep's arrival, the parties had the

following exchange:

| | |
|---|---|
| <u>Estep</u>: | What's your problem Steve? |
| <u>Combs</u>: | Nothin'. |
| <u>Estep</u>: | Get your ass outta here. You got a warrant? |
| <u>Combs</u>: | I'm investigating something. If you don't back up outta my face, you're going to jail. |
| <u>Estep</u>: | Put me out of your face. You ain't doin' shit. |

DE 59 at 23:31:10 to 23:31:29. Estep, just advised that Combs was "investigating[,]" placed

himself directly between Combs and the investigative target, Tim Estep. *Id.* at 23:31:31.

There is no Kentucky authority explicitly interpreting the relevant obstructing or interfering

provision.[15] However, the Commonwealth's interpretive rules are clear enough: "[W]e are required

to give the words of the statute written by the legislature their plain meaning. To do so restricts us

from adding restrictive language . . . where it does not now exist." *Bailey v. Reeves*, 662 S.W.2d

832, 834 (Ky. 1984). The plain meaning of KRS 150.090(6),[16] as well as Kentucky cases

interpreting analogous statutes, generally support a construction aligned with the Sixth Circuit's

reading of Ohio's "obstructing official business" crime, *i.e.*, what is required, to obstruct or

---

[15] The only case directly addressing conduct qualifying as a KRS 150.090(6) violation is not a particularly helpful interpretive aid for this case's circumstances. *See Barnes v. Wright*, 449 F.3d 709, 717 (6th Cir. 2006) ("Pointing a gun at an officer in a manner that creates a substantial danger of injury clearly establishes probable cause for the charge of threatening or attempting to intimidate an officer in violation of § 150.090(6).").

[16] Interference is "[t]he act or process of obstructing normal operations or intervening or meddling in the affairs of others" or, more simply, "[a]n obstruction or hindrance." *Interference*, Black's Law Dictionary (11th ed. 2019). Obstruction means "[t]o make difficult or impossible[,] to keep from happening" or to "hinder[.]" *Obstruct*, Black's Law Dictionary (11th ed. 2019).

interfere is "an affirmative act that interrupts [law enforcement] business[.]" *Lyons v. City of Xenia*, 417 F.3d 565, 574–75 (6th Cir. 2005) (noting that "hostile or abusive speech that obstructs officers from fulfilling their duties may amount to a sufficient affirmative act to sustain a charge of obstructing official business[,]" and finding "[w]here the overall pattern of behavior is one of resistance, moreover, officers may consider the totality of the events and need not point to a single act that rises to the level of obstruction."); *see Brown v. Commonwealth*, 263 S.W. 2d 238, 240 (Ky. 1953) (driving search targeted automobile away while officer was inside courthouse seeking warrant clarification "clearly was an obstruction"); *City of Louisville v. Lougher*, 272 S.W. 748, 751 (Ky. 1925) (overturning an injunction barring defendants "from at any time 'disturbing or dispersing any audience or audiences assembled to hear plaintiff deliver said address or addresses'" as undue court "interfere[nce] with public peace officers in the discharge of their imposed duties"); *Commonwealth v. Glass*, 131 S.W. 494, 494 (Ky. 1910) (prohibition on "unlawfully interfer[ing] with the officers of election in the discharge of their duties" reaches "all forcible interference with the voter, and any intimidation").[17] Under this interpretation (or, for that

---

[17] *See also O'Hara v. Marsh*, No. 2016-CA-001662-MR, 2017 WL 5624609, at *2 (Ky. Ct. App. Nov. 22, 2017) (affirming probable cause finding as to KRS 519.020, noting that plaintiff "physically impeded [the officer], that he physically touched [the officer], that his intent was to prevent the service of [a] summons, and that because of his efforts, his client was able to leave without being served."). The *Marsh* Court affirmed a summary judgment grant and probable cause finding regarding a malicious prosecution claim. The subject statute, "obstruction of governmental operations by force" under KRS 519.020 is (arguably) textually more demanding than KRS 150.090(6). *See* KRS 519.020(1) (requiring use or threatened use of "violence, force[,] or physical interference."). Yet, even under KRS 519.020, "reach[ing] out and touch[ing]" an officer's arm was enough physical contact for the Kentucky courts: "The circuit court determined that **[Plaintiff's] remedy** [for an allegedly defective summons] **was not to physically block [the officer] from carrying out his duties**, but rather to quash the summon[s] in court. This conclusion is supported by the record and the law." *Marsh*, 2017 WL 5624609, at *1–2 (emphasis added); *see also Skuljan v. Commonwealth*, No. 2014-CA-000261-MR, 2016 WL 930160, at *3 (Ky. Ct. App. Mar. 11, 2016) (affirming KRS 519.020 conviction based on wholly verbal threats conveyed to third parties).

matter, any construction faithful to the text), the Court finds that any reasonable juror would conclude that the facts known to Combs presented ample grounds to believe that Estep interfered with the taxidermy investigation. *See Constant v. Commonwealth*, No. 2018-CA-001457-MR, 2020 WL 1966537, at *4 (Ky. Ct. App. Apr. 24, 2020) (finding that "delay in [ ] unlocking" a bedroom door "certainly obstructed" law enforcement in executing a "pickup order" for a minor).

Crucially, probable cause is assessed on the full contextual picture. The video, here, depicts Estep issuing profanity-laced demands for Combs to depart the scene of an investigation. Plaintiff's demeanor and posture are undoubtedly quite antagonistic; his words (considering both volume and content) and conduct are unquestionably disruptive. When Combs advised Estep to back-off, Estep challenged: "Put me out of your face."[18] Estep's interjection plainly halted Combs's taxidermy investigation in its tracks. In short, Plaintiff's agitative intrusion was paradigmatically interfering, and Estep's "hostile behavior would give a reasonable officer cause

---

[18] *See Patrizi v. Huff*, 690 F.3d 459, 464 (6th Cir. 2012) ("Ohio courts have affirmed obstruction convictions premised on true speech only when that speech involved yelling, cursing, aggressive conduct, and/or persistent disruptions after warnings from the police against interrupting the investigation.").

to believe that an arrest for obstructing" or interfering "was appropriate." *See Lyons*, 417 F.3d at 574–75 (applying Ohio law); *see also Phillips v. Blair*, 786 F. App'x 519, 527 (6th Cir. 2019).[19]

Estep, further, fails in his duty to "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Arrington-Bey v. City of Bedford Heights*, 858 F.3d 988, 992-93 (6th Cir. 2017) (requiring a plaintiff to "identify a case with a similar fact pattern that would have given 'fair and clear warning to officers' about what the law requires"). Indeed, the lack of caselaw delineating the requisites for a valid KRS 519.090(6) arrest is, itself, a potentially fatal problem for Estep's effort to defeat the qualified immunity assertion. *See, e.g.*, *Patrizi*, 690 F.3d at 465 n.4 (rejecting defendants' proposed reliance on prior Circuit decision as involving "a Michigan obstruction statute, not the Ohio statute at issue here"). But, even if analogous precedent might have provided a reasonable officer sufficient notice of the valid probable cause parameters in this scenario, the parallel caselaw (as the above discussion demonstrates) affirms the constitutionality of Combs's conduct here. *Compare City of Wyoming*, 821 F.3d at 717 (finding plaintiff's "generally peaceful" demeanor would have alerted a reasonable officer that "he lacked probable cause to arrest

---

[19] If KRS 150.090(6), like Ohio official business obstruction, *see Smith v. City of Wyoming*, 821 F.3d 697, 717 (6th Cir. 2016), and KRS 519.020, requires specific interfering or obstructive intent, the same facts justifying a prudent officer's belief that Estep factually interfered foreclose a genuine dispute as to what a reasonable officer would have understood regarding Plaintiff's intent. The most-Plaintiff favorable view of the facts is that Estep acted with intent for Combs to immediately depart. That purpose, given the mid-investigation circumstances (of which, per the video, Estep was immediately apprised), was interfering. The Court realizes that probable cause is often a jury question but sees a lone rational result here. However, even if the Court thought probable cause debatable, Combs surely had sound reasons to perceive adequate cause. This would cloak Combs in qualified immunity. *See Phillips*, 786 F. App'x. at 527 ("Even if a factual dispute exists about the objective reasonableness of the officer's actions, a court should grant the officer qualified immunity if, viewing the facts favorably to the plaintiff, an officer reasonably could have believed that the arrest was lawful.") (quoting *Kennedy v. City of Villa Hills*, 635 F.3d 210, 214 (6th Cir. 2011)).

20

[plaintiff] under the clearly established law of obstruction of official business in Ohio"), *with King v. Ambs*, 519 F.3d 607, 611 (6th Cir. 2008) (affirming qualified immunity, noting plaintiff "was arrested after repeatedly interrupting an officer who was questioning a third party[,]" and agreeing with trial court's observation that plaintiff's "conduct in persisting to interfere with [law enforcement's] investigation amounted to a physical interruption of the questioning").

    *C. Excessive Force*

    The Sixth Circuit has succinctly stated the general rubric for Fourth Amendment excessive force claims:

> Whether an officer's use of force in effecting an arrest violates the Fourth Amendment is a question of whether his actions are objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation. . . . The test is reasonableness at the moment force is used, judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The court must carefully balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. . . . Three factors guide this balancing: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. . . . Though important, these factors are not the end of the matter, as the court ultimately must determine whether the totality of the circumstances justifies a particular sort of seizure.

*Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *Graham* factors) (quotation marks omitted). More specifically, "excessively forceful or unduly tight handcuffing is a constitutional violation under the Fourth Amendment[.]" *Courtright v. City of Battle Creek*, 839 F.3d 513, 518–19 (6th Cir. 2016) (internal citations and quotation marks omitted). The Sixth Circuit has identified three elements for an unreasonably tight handcuffing claim: (1) the plaintiff "complained the handcuffs were too tight; (2) the officer ignored those complaints; and (3) the plaintiff experienced 'some physical injury' resulting from the handcuffing." *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, 401 (6th Cir. 2009) (citing *Lyons*, 417 F.3d at 575–76).

"The third prong clearly requires but-for causation between the physical injury and the handcuffing." *McNally v. Tabor*, No. 6:18-CV-16-REW-HAI, 2019 WL 6044882, at *11 (E.D. Ky. Nov. 15, 2019) (collecting cases).

Here, Defendant does not seriously dispute that Estep protested the tightness of the handcuffs—and for good reason. Both men present for the dialogue, Estep and Combs, testified to as much. *See, e.g.*, Estep Dep. at 32, 106 ("I was hurting so bad, I asked him twice. Probably 15-minute increments, I told him he was going to have to loosen the[ ] handcuffs, they [were] killing me."); Combs Dep. at 52 (Estep "complained that [the handcuffs] hurt . . . [o]nce or twice."). Nor does Combs directly contest Estep's claim that the complaints were ignored. *See* Estep Dep. at 107 (claiming Combs "[a]cted like he didn't hear me"); Combs Dep. at 52 (allegedly responding "we're getting ready to go in; I'll check them when we get out"), 53 (admitting he did not respond, at least, "at that moment").

Instead, Combs's elemental challenge to the handcuffing claim focuses on the third prong. *See* DE 55-1 at 19–20. In this Circuit, "a subjective recounting of pain without some corroboration is not enough." *Rudolph v. Babinec*, 939 F.3d 742, 752 (6th Cir. 2019). But Estep provides more than a subjective assessment. He supplies a photo, which he claims his wife took the day after the incident, showing heavy bruising on his hand and a wound on his wrist. DE 61-3 That proof, along with Estep's testimony, would satisfy the Circuit standard. *See Rudolph*, 939 F.3d at 752 ("The pictures coupled with [plaintiff's] testimony suffice at this stage to withstand a qualified immunity challenge."). But Estep offers more; corroborative medical records describe the damage as a "handcuff injury[.]" DE 61-1. Estep's showing is, at this stage, more than sufficient to reach a jury.

The defense relies on Kentucky's general requirement for "expert or medical testimony" to establish legal causation for personal injury claims. *Id.* (quoting *Blair v. Geico General Ins. Co.*,

917 F. Supp. 2d 647 (E.D. Ky. 2013). To the extent Kentucky's medical causation requirement is applicable in this context,[20] (and assuming Plaintiff's medical records would not qualify) the Court finds that the causal relationship between application of handcuffs and wrist/hand injuries (of the type the image depicts) fits comfortably within Kentucky's laymen exception: "There may, of course, be situations in which causation is so apparent that laymen with a general knowledge would have no difficulty in recognizing it." *Jarboe v. Harting*, 397 S.W.2d 775, 778 (Ky. 1965); *see, e.g.*, *Tatham v. Palmer*, 439 S.W.2d 938, 938–39 (Ky. 1969) (permitting jury consideration of causation, without expert proof, for headaches, forehead and chin abrasions, regarding car accident in which plaintiff's head struck a windshield); *Roark v. Speedway*, LLC, No. CV 13-139-ART, 2015 WL 12978822, at *2 (E.D. Ky. Apr. 6, 2015) ("The causal relationship between an electrical shock and a [wrist] burn is certainly 'within the realm of common knowledge.'").

Several of Defendant's other prong 3 arguments depend on disregarding the applicable Rule 56 standard. The Court rejects that approach. Accordingly, Combs's arguments based on what Plaintiff could not show with regard to his injuries, DE 55-1 at 19, speculation regarding other potential sources for the damage, *id.* at 20, or what the "lay eye" might view as the likely source of the photographed wounds, *id.*, do not here prevail. At this stage, Estep need not prove liability or eliminate all possible alternative causes. Rather, to stave off summary judgment, he

---

[20] Estep does not dispute the applicability of state-law principles on this topic. Section 1988(a) instructs federal courts in choosing law applicable to § 1983 actions. 42 U.S.C. § 1988(a). Generally, the statute direct federal courts to apply state law where federal law is deficient, unless the proposed gap-filler conflicts with other federal law or policy. *See id.* The Sixth Circuit has expressly held that, "[c]ommon law tort principles govern causation in the § 1983 context." *Martin v. Warren Cty., Kentucky*, 799 F. App'x 329, 337 (6th Cir. 2020). Estep failed to argue that Kentucky's medical causation requirement is inconsistent with federal law or policy. Thus, consistent with the parties' treatment, the Court assumes, though without deciding, that the Commonwealth's causation standard pertains.

must demonstrate only a triable issue. As to prong 3 causation and injury (again, the only seriously challenged element), Estep showed just that.

Finally, as the Court reads the briefing, the balance of Defendant's challenge to the force claim relies on qualified immunity's "reasonableness" gloss. *See, e.g.*, DE 55-1 at 16–18, 21–22.[21] However, the Sixth Circuit has explicitly held that "freedom from excessively forceful or unduly tight handcuffing is a clearly established right for purposes of qualified immunity." *Courtright*, 839 F.3d at 519 (internal citations and quotation marks omitted). And, this case is decidedly unlike, for example, *Fettes v. Hendershot* (cited by Combs), which involved a "failure to respond to a complaint about tight handcuffs during a ten-minute ride to the police station[.]" 375 F. App'x 528, 533 (6th Cir. 2010). The *Fettes* Court granted defendants qualified immunity on grounds that precedent failed "to notify the officers that any response to a complaint of tight handcuffing other than an immediate one constitutes excessive force." *Id.* The Circuit distinguished prior denials of qualified immunity, reasoning "the officers here acted without malice and with reason—they declined to loosen the handcuffs in light of the short, ten-minute transport to the police station." *Id.* This matter differs in critical ways.

Appropriately viewing the facts in the light most favorable to Plaintiff, Combs left Estep cuffed for approximately 50 minutes; at a bare minimum, 15 minutes followed Estep's first tightness complaint. *See, e.g.*, Estep Dep. at 106. During this period, Combs was not driving or

---

[21] Combs claims "Estep cannot show that Officer Combs put the handcuffs on" too tightly. DE 55-1 at 18. He claims the video and Estep's testimony reflect this. *Id.* ("The record including the video and Jack Estep's own testimony indicate that" Combs did not put the handcuffs on Estep "excessively tight."). But, two problems. First, the argument relies on a factually baseless interpretation of the record evidence. The video does not capture the relevant out-of-frame act, and Estep explicitly alleges overtight cuffing. Second, the contention challenges Estep's ability to "show" something that is not an element of his claim. Plaintiff needed to show a genuine dispute as to ignored complaints and injury stemming from the handcuffing. He did not need to satisfy Defendant's subjective interpretation of proper cuff tightness.

otherwise in transit, he was sitting in a parking lot writing a report. The record reveals, and Combs claims, nothing exigent about his need to complete the citation. Crediting Estep's version, Combs ignored, for over a quarter of an hour, a blatant claim of excruciating pain and outcry for help that would have taken no more than a few moments to address. Were this not enough, per Estep, Combs also ignored a second complaint and, ultimately, removed the handcuffs only on transferring Estep to jail personnel. This course of conduct, distinguishable from *Fettes*, falls within the heartland of the unduly tight handcuffing prohibition as clearly established at the time of Estep's arrest. *See Lyons*, 417 F.3d at 575–76 (holding the "general principle" that "unduly tight handcuffing in the course of an arrest" was "clearly established" as of a 1998 arrest and, in the 2005 decision, describing the 3-element test applied here); *see also Babinec*, 939 F.3d at 751 ("Conduct, not time, is the measurement of a violation.").

## IV.   STATE CLAIMS

### A.  False Imprisonment

In the Commonwealth,

> False imprisonment is the intentional confinement or instigation of confinement of a plaintiff of which confinement the plaintiff is aware at the time. . . . A law enforcement officer is liable for false imprisonment unless he or she enjoys a privilege or immunity to detain an individual. Two common examples of a law enforcement officer's privilege to detain an individual are (1) an arrest pursuant to a warrant or (2) an arrest without a warrant in which the officer has probable cause, that is, reasonable objective grounds to believe that a crime was committed and that the plaintiff committed it.

*Dunn v. Felty*, 226 S.W.3d 68, 71 (Ky. 2007) (citations, quotation marks, and alterations omitted). Kentucky's probable cause standard is materially identical to the federal standard. *See Williams v. Commonwealth*, 147 S.W.3d 1, 7 (Ky. 2004). Thus, the Court's conclusion above as to the lack-of-probable-cause element also decides this claim. *See Dunn*, 226 S.W. 3d at 71; *Ming Wen Chen v. Pawul*, No. 2016-CA-001860-MR, 2018 WL 3814764, at *2 (Ky. Ct. App. Aug. 10,

2018), *review denied* (June 5, 2019) ("A law enforcement officer cannot be held liable for false imprisonment where he enjoys the privilege to detain an individual. A [peace] officer is statutorily authorized to conduct a warrantless arrest if he directly observes the suspect committing a felony or a misdemeanor[.]" (citing KRS 431.005)); *Mercer v. Commonwealth*, 880 S.W.2d 899, 901 (Ky. Ct. App. 1994) ("Conservation Officer had the authority to stop and arrest appellant for DUI"); Ky. Op. Att'y Gen. No. 98-2 (Feb. 17, 1998) ("Officers of the KDFWR have been granted 'peace officer' authority by the General Assembly. As 'peace officers,' the officers of the KDFWR fall within the class 'peace officers' as set forth in KRS 446.010 (24) and vested with the abilities to make arrests and issue citations as per KRS 431.005 and KRS 431.015.").

One more important point, unaddressed by either party. The Kentucky Supreme Court has not directly addressed whether probable cause to arrest for a single charge forecloses, like the constitutional analogue, a false imprisonment claim. *See Howse*, 953 F.3d at 409 ("[T]he constitutional tort claim of false arrest fails so long as there's just one valid reason for the arrest."). Federal courts exercising supplemental jurisdiction apply substantive state law consistent with the state high court's binding rulings. *Whitlock v. FSL Mgmt., LLC*, 843 F.3d 1084, 1089 (6th Cir. 2016). In the absence of such a controlling decision, federal courts "must predict how that court would rule, by looking to 'all available data.'" *Id.* State appellate decisions "should not" absent persuasive data that the state supreme court would disagree, "be disregarded[.]" *Id.*

Judge Reeves, after thoroughly canvassing the relevant state authority and conducting circumspect analytical treatment, previously predicted that the Kentucky Supreme Court would (consistent with the U.S. Supreme Court's *Devenpeck* ruling) require the absence of a valid objective basis for arrest on <u>any</u> charge to satisfy the state tort's probable cause element. *Warren v. Lexington-Fayette Urban Cty. Gov't Police Dep't*, No. 5:16-CV-140-DCR, 2017 WL 2888716,

26

at *6 (E.D. Ky. July 6, 2017). The Kentucky Court of Appeals has hewed to *Devenpeck*'s subjective/objective line for probable cause analysis. *See Parker v. Commonwealth*, No. 2005-CA-001737-MR, 2006 WL 2034227, at *5 (Ky. Ct. App. July 21, 2006). *Devenpeck*'s objective focus explains why a constitutional false-arrest claim fails in the face of one, even just one, valid arrest basis. *See Howse*, 953 F.3d at 409. *Parker* is entirely consistent with the Kentucky high court's reliance on U.S. Supreme Court precedent in fashioning its probable cause jurisprudence. *See Williams*, 147 S.W.3d at 7–8 (referencing, *inter alia*, *Maryland v. Pringle*, 124 S. Ct. 800 (2003), *Illinois v. Gates*, 103 S. Ct. 2317 (1983), and *Schmerber v. California*, 86 S. Ct. 1826 (1966)). Thus, *Warren*'s thoughtful analysis stands well-supported by the available Kentucky court signals. The Court, particularly given the absence of advocacy for a contrary interpretation, adopts *Warren*'s forecast. Accordingly, the Court, given the above probable cause analysis, dismisses the false imprisonment claim.[22]

B.    *Malicious Prosecution*[23]

In Kentucky, a

malicious prosecution action may be established by showing that:

1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding . . . against the plaintiff;

---

[22] The Court thus declines a distinct state qualified official immunity analysis.

[23] The Sixth Circuit "recognize[s] a separate constitutionally cognizable claim of malicious prosecution under the Fourth Amendment." *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003). "Such a claim encompasses wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). Estep does not now and has not previously pursued the malicious-prosecution allegation as an additional § 1983 theory. *See, e.g.*, DE 61 (identifying only "unreasonable seizure and excessive force" as stemming from § 1983). In any event, "a § 1983 claim is premised on the violation of a constitutional right," and Estep, as previously discussed, has supported no constitutional injury other than arguably unreasonable force via handcuffing. *Sykes*, 625 F.3d at 308. The Court's probable cause conclusion would likewise warrant summary judgment for Combs on this un-litigated claim. *See Howse*, 953 F.3d at 409.

2) the defendant acted without probable cause;

3) the defendant acted with malice, which, in the criminal context, means seeking to achieve a purpose other than bringing an offender to justice . . .;

4) the proceeding . . . terminated in favor of the person against whom it was brought; and

5) the plaintiff suffered damages as a result of the proceeding.

*Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016). Here, the parties dispute only the second and third elements.

The Court's determination that a reasonable juror could, on this record, conclude only that the facts known to Combs provided probable cause for, at minimum, a KRS 150.090(6) arrest might conceivably resolve this claim. *See Martin*, 507 S.W.3d at 11–12; *Allen v. Rucker*, 304 F. Supp. 3d 638, 647–48 (E.D. Ky. 2018); *Hall v. City of Williamsburg*, No. 6:16-304-DCR, 2017 WL 3668113, at *10 (E.D. Ky. Aug. 24, 2017); *King v. Storm*, No. 6:15-cv-172-GFVT, 2017 WL 2174959, at *8 (E.D Ky. May 17, 2017).

But, one problem (again, untreated by either side): "Kentucky law is unclear whether, in the context of multiple charges, the probable cause element requires a malicious prosecution plaintiff to show that no probable cause existed on any of the charges, and Kentucky courts have not addressed directly whether a finding of probable cause on one charged offense precludes a malicious prosecution claim on the remaining charges." *Smith v. Peyman*, 93 F. Supp. 3d 738, 750 (E.D. Ky. 2015). Federal district court predictions vary. *Compare Martin v. Coyt*, 2013 WL 1187940, at *4–5 (W.D. Ky. Mar. 21, 2013), *with Hartman v. Thompson*, No. 3:16-CV-00114-

GNS-DW, 2018 WL 793440, at *15 (W.D. Ky. Feb. 7, 2018), *aff'd*, 931 F.3d 471 (6th Cir. 2019).[24]

The Kentucky majority, Eastern and Western District, forecast that "the Kentucky Supreme Court would hold that a defendant initiating criminal proceedings on multiple charges is not necessarily insulated in a malicious prosecution case merely because the prosecution of one of the charges was justified." *Peyman*, 93 F. Supp. at 750 (citing *Coyt*, 2013 WL 1187940, at *4–5, and *Carter v. Porter*, 2011 WL 778408, at *1–2 (E.D. Ky. Mar. 1, 2011)); *see also Hadden v. Wathen*, 2018 WL 4222882, at *18 n.28 (W.D. Ky. Sept. 5, 2018) (denying summary judgment despite plaintiff pleading "guilty to possession of marijuana" based on factual disputes concerning probable cause for prosecution of charges for "menacing, resisting arrest, and terroristic threatening"). Defendant, facing the burden, does not argue for (much less justify) application of the minority approach. Thus, the Court follows the majority. Accordingly, persisting factual disputes concerning probable cause for the menacing and resisting charges preclude summary judgment on the state-tort's second element.

Concerning the third predicate, "malice is the intentional doing of a wrongful act to the injury of another, with an evil or unlawful motive or purpose." *Stearns Coal Co. v. Johnson*, 238 Ky. 247, 252, 37 S.W.2d 38 (Ky. 1931). The element "can be inferred from lack of probable cause." *Phat's Bar & Grill v. Louisville Jefferson Cty. Metro Gov't*, 918 F. Supp. 2d 654, 665 (W.D. Ky. 2013) (quoting *Massey v. McKinley*, 690 S.W.2d 131, 134 (Ky. 1985)).

> The jury, however, may not invariably imply malice from the mere want of probable cause if all the facts disclosed lead to a different conclusion. If malice was to be inferred from want of probable cause alone, then there would be no necessity

---

[24] Recently, the Sixth Circuit held that "there's no principled reason for treating a Fourth Amendment malicious-prosecution claim differently than a Fourth Amendment false-arrest claim." *Howse*, 953 F.3d at 409. However, state-law malicious prosecution is founded in the common law not the federal constitution. *See Martin*, 507 S.W.3d at 7 ("Malicious prosecution is an ancient and well-established common law cause of action with a long history in Kentucky jurisprudence."). Thus, the Sixth Circuit's § 1983 ruling does not decide the issue.

for having a distinct requirement that malice be proven, for want of probable cause
would then be the only element necessary to be established.

*Mosier v. McFarland*, 269 Ky. 214, 217, 106 S.W.2d 641 (Ky. 1937). Thus, the existence of a

genuine dispute concerning just cause for prosecuting the menacing and resisting charges is on its

own insufficient (and particularly given the justifiable interference charge) to support a finding of

malice. However, the probable-cause doubts do not, on this record, stand alone. Other evidence of

unlawful motive, accepting Estep's version, includes:

- *Conflict History*: Estep testified to a host of run-ins between Combs, himself, and other
  members of the Estep clan before the night in question. Combs confirmed, generally, many of
  these events.  To name a few: Combs cited Estep for a boating light violation (and stopped him
  on several occasions for the same issue); Combs wrote Tim Estep a ticket for "coming in too
  fast" at a dock; Combs once stopped Victoria Estep to inquire regarding Tim's whereabouts;
  Combs staked out a property where he believed Tim was hunting (after noticing his parked
  vehicle) and, after the hunt, cited Tim for failure to wear his hunter orange hat; and after
  learning that another of Plaintiff's sons (David Estep) signed an online petition for his removal
  as officer, Combs confronted David about his signature. Estep Dep. at 55, 58, 62, 67–69, 80–
  81; Combs Dep. at 13–25. The temporal circumstances of Combs's investigation, though not
  legally problematic, also offer some potential factual support for Plaintiff's depiction of Combs
  as, perhaps, out to get the Esteps; 10:30 p.m. is quite the late hour for a taxidermy investigation.

- *Handcuff Taunting*: Plaintiff alleges that Combs, on the night in question, "taunted" him by
  dangling handcuffs after telling Estep he was going to jail. The video provides a potentially
  supportive depiction. The film shows Combs removing his handcuffs well-before effecting the
  arrest, though it does not, itself, display "taunting." DE 59 at 23:32:30. However, the fact that
  the video does not rule out Estep's claim is, for present purposes, the key. Estep interpreted
  Combs's conduct in that way and, as the Court does here, a juror could reasonably accept that
  testimony.

- *Excessive Force*: The record undergirding the Court's analysis of the handcuffing claim
  provides further malice indicia.

In sum, Estep family's history with Combs, Plaintiff's allegations of handcuff taunting, Combs's

failure to respond to Estep's handcuff pain protests, and probable cause doubts concerning

menacing and resisting supply adequate circumstantial grounds for a juror to reasonably conclude

that Defendant maliciously lumped on additional and arguably lawless charges. Given the

persisting jury questions, the Court denies summary judgment on the state malicious prosecution claim.[25]

## V.      CONCLUSION

For the reasons, to the extent, and on the terms stated, the Court **GRANTS IN PART AND DENIES IN PART** DE 55.[26] Estep may proceed with his § 1983 excessive force and state-law malicious prosecution claims against Combs.

This the 17th day of June, 2020.

Signed By:

_**Robert E. Wier**_

**United States District Judge**

---

[25] To the extent Combs asserts qualified official immunity as a shield to the malicious prosecution claim, the defense is "unavailable in [ ] malicious prosecution action[s]." *Martin*, 507 S.W.3d at 5.

[26] Combs, well after the close of the dispositive briefing, filed a motion in limine. *See* DE 73. Combs's evidentiary challenge does not request exclusion of evidence from the Court's Rule 56 review. Accordingly, the Court will separately rule on the liminal effort via independent Order.